ELLITHORPE AIR-BRAKE CO. *v.* SIRE.

*(Circuit Court, S. D. New York. March 6, 1890.)*

1. CONTRACTS—REFUSAL TO ALLOW PERFORMANCE.
   Defendant made no objections to plans for elevator cars contracted for, when submitted to him, and stood by until one had been put in, when he became dissatisfied with its carrying capacity, and asked to have a different car used in the second elevator, which was then, with the exception of putting the car in place, nearly completed, but refused to give a written order for the change, and prevented plaintiff's men from putting in the original car. Plaintiff had had difficulty in getting the payments desired as the work progressed, and refused to make a change without a writing. *Held*, that defendant had accepted the plans, and was guilty of a breach of contract in refusing to allow plaintiff to put the second car in.

2. SAME—DAMAGES FOR BREACH.
   Plaintiff, having provided machinery for an elevator, and delivered it on defendant's premises, and having been wrongfully prevented by defendant from completing the contract, can recover the full value of his labor and materials, though defendant afterwards finished the elevator, not using the detached portion of plaintiff's materials.

3. SAME.
   Damages for refusal to accept elevators ordered, where they remain at the factory, and no loss of profits is proved, consist in the cost of storage and insurance.

At Law. Action for breach of contract.
*Samuel Ashton*, for plaintiff.
*Albert I. Sire* and *Chauncey Shaffer*, for defendant.

SHIPMAN, J. This is an action at law, which was tried by the court; a trial by jury having been waived by written stipulation signed by the parties. Upon said trial the following facts were found to have been proved, and to be true: The plaintiff is, and was at the commencement of this suit, a corporation duly incorporated under and by virtue of the laws of the state of Illinois, and located in and an inhabitant of Chicago, in said state, where it has and continuously has had its principal place of business. The defendant is, and was at the commencement of this suit, a citizen of the state of New York, and a resident and an inhabitant of New York city, in the southern district of said state. The plaintiff is a manufacturer of elevators. On or about October 1, 1888, the plaintiff and defendant entered into a written contract whereby the plaintiff agreed to furnish and erect for the defendant, in a good, substantial, and workman-like manner, two hydraulic passenger elevators in his double

apartment or flat buildings on Fifty-Ninth street, opposite Central park, and known as the "East and West Flats," and two safety steam passenger elevators,—one in the adjoining residence building on Fifty-Ninth street, and one in the office building corner of Center and Reade streets,—all in the city of New York; making in all four elevators, with the appurtenances and appliances as specified and agreed upon, ready for use in 80 to 90 days from date of receipt of approved plans, for the sum of $6,750; one-half thereof to be due and payable when the machines were in the buildings, and the other half thereof to be paid when the said elevators were up, and in complete running order; payments to be made upon the written order of the plaintiff, provided the defendant should be satisfied with the amount, as the work progressed.   The plaintiff, in its complaint, avers that it complied with the terms and conditions on its part to be performed, and erected, and completed in running order, the elevator in the West flat, and very nearly completed the erection of the elevator in the East flat, when the prosecution of the work was stopped and prohibited by the defendant; that the steam elevators were ready for shipment, but the defendant requested that they should not be shipped from Chicago, but should remain there in store until he should decide upon some proposed changes, all of which was done, and that they remained subject to his order; that he has never ordered the same to be shipped, although the plaintiff has been ready to do so, and to comply with the contract. The complainant also alleged that it had suffered special damage by reason of obstructions and hindrances by the defendant to the rapid prosecution of said work, and had incurred extra expense for insurance and storage of the property.   The sum of $1,900 was paid by the defendant upon the contract.   The defendant alleges in his answer that the plaintiff wholly neglected and failed to perform its contract, and also sets up a counter-claim for damages arising from such neglect.

The finding of facts in this case is made difficult by the complete antagonism of the witnesses for the respective parties to each other in regard to almost every important fact in the case.   This diversity commences with the terms of the written contract; the respective copies which are produced by the parties being unlike.   Quite an important part of the terms of payment contained in the printed proposals of the plaintiff is erased in the defendant's copy, and upon the question whether this erasure was made by consent or wrongfully the parties are at variance.   I am convinced of the honesty of each of the witnesses Godwin and A. B. Ellithorpe, whose testimony upon this point is not reconcilable.   The weight of the testimony leads to the conclusion that the contract, which has been heretofore stated, and which is known in the case as "Exhibit D," was the one which was made.   Exhibit C was made in the manner and at the time stated by A. B. Ellithorpe.

On October 28, 1888, A. B. Ellithorpe, the plaintiff's general manager, came to New York with Frank Roche, his foreman, and on the next day saw the defendant, and the different buildings in which the elevators were to be placed.   Roche did not commence work until December 20th, when he began in the apartment house on Fifty-Ninth street.

During a portion, at least, of his time, he was at work in the erection of elevators for other people. The reason which is given by the plaintiff for this delay is that the Fifty-Ninth street cellars and the hatchways were not ready for the elevators, and that it was practically impossible to commence sooner. There may have been some ground for this assertion on the very first few days of November, but the extent and the duration of this alleged cause are very much exaggerated. The important reason was that the machinery was not completed in Chicago. This conclusion is based upon the correspondence. On November 28, 1888, the plaintiff wrote the defendant as follows: ,

"We to-day send you design of cars for your passenger elevator for your approval; all cars to be of the same design. Please approve and return same, so that they may be put under way. The hydraulic engines are under way, and will soon be ready to ship."

On November 30th the defendant wrote the plaintiff requesting an interview in regard to the Center and Reade street elevator, to which the plaintiff replied, on December 3d: "Your elevators are being pushed with all possible dispatch;" and, in regard to the Center-Street elevator, that it was waiting the defendant's decision in regard to his option as to the kind of machine which he would take. At the date of this letter the machines were, manifestly, not ready in Chicago. The machinery for the hydraulic elevators reached New York about December 22, 1888. While this delay existed, and its chief cause is to be attributed to the plaintiff, the defendant was not particularly burdened or annoyed by it. He was not at that time, apparently, anxious for the speedy completion of his houses. The plaintiff prosecuted its work in the apartment houses with some breaks, occasioned, to a very limited extent, by the fact that its workmen were at times hindered by the use of the stairways by the defendant's workmen. On January 24, 1889, it drew upon the defendant for $1,500, which draft was returned protested; and then it stopped work on account of this non-payment. On January 31st the defendant complained by letter of this cessation, which he said was not in accordance with the contract. The plaintiff replied on February 2d, claiming compliance, and on February 8th the defendant agreed in writing to pay $1,-500 on account, "as per contract," immediately after the elevator in the West flat was running. Work was then resumed, and the elevator in the West flat was completed March 6th, and the $1,500 were paid in accordance with the agreement of February 8th. At this time the work upon the elevator in the East flat was nearly done. The only remaining work was to place the car in position, and to connect with it the cables, sheaves, and fittings. The car and these articles were in the cellar, ready to be put up. Two weeks' work would have completed the elevator.

The design for all the cars was sent to the defendant for his approval by letter of November 28th, which has been heretofore quoted. The contract specified that the design was to be submitted for approval. The other plans had been approved. The defendant did not reply by letter, but in January the general manager of the plaintiff saw him in New York on the subject. He did not dissent to the design, and cars for the apart-

ment house elevators were thereupon built accordingly. The design or plan for the cars was shown by Mr. Roche to Mr. Godwin, the architect, who disliked it, and objected to it on account of its small size. The well-hole or hatchway was a small one, and he wanted as much room as possible in the car. The design was for a "side-post" car, and was as large as the well-hole permitted, but in a side-post car there are, necessarily, inside projections, which diminish the inside size or capacity of the car for carrying passengers. When the dimensions are necessarily small, a "corner-post" car furnishes considerably more inside space. The architect objected to this kind of car, but no one declined to accept the design, and no one demanded or required of the plaintiff a corner-post car. The defendant communicated nothing definite and positive, —by his acts assented to the design,. and permitted the side-post car to be put up in the West flat without objection. When that elevator was completed, and he saw the car in running order, he was disappointed at its carrying capacity; but he accepted the elevator. On March 7th, he told Mr. Ellithorpe that he wanted a corner-post car for the East flat, who replied that he would put one in, if he had a written order to that effect. His idea was that he was to have an extra price for the change, inasmuch as a new car would be required. Mr. Sire replied that he would not give a written order; that they were honest people. Ellithorpe had been annoyed and troubled at Sire's refusal to pay more money as the work progressed, distrusted him, refused to change without a written order, and also wanted an additional payment for the work done upon the East flat, which Sire refused to give. As to what subsequently happened,—and this is the part of the case in regard to which I am in most doubt,—the parties are at a total disagreement. The plaintiff's theory is that Sire prevented its workmen from prosecuting the work, and drove them out of the building. The defendant's theory is that the plaintiff voluntarily stopped and abandoned the work, because it could get no money, and that prior to its abandonment, viz., on March 7th, he told the plaintiff to go on with the work. It is true that the plaintiff wanted a payment, but it had completed one elevator, and could complete another in a short time. That part of the job was almost at an end. On the other hand, Sire wanted a corner-post car in the East flat, and gave orders not to allow a side-post car to be placed; and when the plaintiff's men went there, and entered upon the work, preliminary to putting up such a car, they were stopped, and told not to put it up. They were not prevented from any kind of work. They were prevented from putting up a side-post car. The turning-point in this part of the case is the dissatisfaction of Sire with the carrying capacity of the car, his determination to have a corner-post car, and to get it without having bound himself to pay a new price for it. By the contract, the defendant was to have the option, at any time within 30 days, of substituting a screw-worm belt elevator in place of the direct steam elevator in the Center-Street building, at a reduced price. He did not make the substitution. About December 9th, he made a bargain to sell the building, and he wanted to be released from the Center-Street part of the contract.

He had told the plaintiff that he was thinking of selling the building, and, if it was sold, asked the cost of cancellation. He was subsequently told that it would be $200. He then told the plaintiff not to ship the machinery for that elevator, and he would either provide another building for it, or make a bargain to have the plaintiff take it back. About the same time the defendant also had in contemplation a change in the private house in Fifty-Ninth street from a steam to a hydraulic elevator, inquired of the plaintiff the cost of such a change, and instructed it to retain, and not to ship, the steam elevator. The machinery for these elevators was consequently held by the plaintiff, in its warehouse, awaiting orders from the defendant, which were never given, although his attention was called to the importance of a decision by letters of February 2d and March 11th. The market value of the finished work of each machine unset was $650 to $700. A fair price for the storage and insurance is $25 per machine. The value of the work done by the plaintiff in the private residence was $60. The value of the elevator in the West flat was $2,200. The outlay for and value of the work and labor, and set machinery, and the unset car and machinery, in the East Flat, was $2,050. The defendant afterwards provided another car, and finished the East flat elevator at his own expense, not using the plaintiff's materials therefor, which are still in the building. It was not finished on May 1st. On March 11th the plaintiff wrote the defendant, claiming a loss on account of delays and obstructions in consequence of his non-compliance with the contract; that two steam machines had been finished, and were held in store by his instructions; claiming that half the contract price was due by the terms of the contract; asking for its payment, and for a meeting in which they might determine all the questions which were involved. The defendant's brother and attorney replied on March 14th, asserting a readiness to fulfill the contract,—a desire that the plaintiff should fulfill without delay; that there was nothing to determine upon except for the plaintiff to execute the contract; and denying that he then owed any sum whatever. There was, manifestly, much to determine in regard to the steam elevators.

Neither party complied with the contract. The plaintiff did not complete the elevators in the apartment house within the specified time. This non-compliance was fully waived by the defendant. The defendant had in fact accepted plans for the cars. He did not decline to accept them when they were submitted, and he permitted the car to be put into the elevator; the work passing almost daily under his observation. He could not thereafter require a corner-post car in the East flat elevator without compensation, and could not compel the plaintiff to stop work unless it provided such new car. The refusal of the defendant to permit the completion of the East flat elevator by the erection of a side-post car was a breach of the contract, and there was no willful abandonment of the work on the part of the plaintiff. The defendant lost rent upon some of the apartments in the East flat because the elevator was not running on the 1st of May, but such loss is attributable to his own conduct; and upon the counter-claim no loss or damage is proved

for which the plaintiff is liable. The plaintiff was at all times ready and willing to perform its part of the contract, except in the matter of time, which breach was waived by the defendant. The plaintiff having in good faith built and completed the West flat elevator, though not within the time prescribed by the contract, and the defendant having accepted the work, the plaintiff can recover the value of the elevator.

Inasmuch as the plaintiff had fully provided machinery, car, and appliances for the East flat elevator; had delivered them all to the defendant upon his premises in pursuance of the contract, where they still remain; had set the machinery, and nearly completed the work and labor upon the elevator, and was without its fault prevented by the defendant from completing the performance of the contract,—it is entitled to recover its loss, which consists, in this case, of its outlay, and is the sum of $2,050. It is also entitled to recover damages from the defendant's virtual refusal to have the contract in regard to the steam elevators carried out. As the machinery is still on hand, and no loss of profits is proved, the damages are merely the proper cost of the storage, and the expenses of insurance, viz., $50. The plaintiff is also entitled to recover $60; the same being the value of the work and material placed upon the private residence. The sum of $1,900 having been paid by the defendant, the balance which was due is $2,485; for which sum, with legal interest from March 14, 1889, as a part of the damages, let judgment be entered for the plaintiff.